UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:12-MC-00004

QUESTAR CAPITAL CORPORATION                                    Petitioner

v.

THOMAS J. GORTER                                              Respondent

## MEMORANDUM OPINION

This matter is before the Court upon Petitioner Questar Capital Corporation's "Petition to Vacate Arbitration Award," (Docket No. 1); Respondent Thomas J. Gorter's "Combined Motion to Dismiss and/or for Summary Judgment on Questar Capital Corporation's Petition to Vacate and Motion to Confirm Arbitration Award," (Docket No. 11); Respondent Gorter's "Motion to Dismiss Questar Capital Corporation's Improper 'Petition' to Vacate Arbitration Award," (Docket No. 12); and Petitioner Questar's "Motion to Vacate," (Docket No. 23). Because the several motions in this case present varying arguments but are necessarily interrelated, the Court will address the parties' respective arguments collectively in the Opinion that follows.

TABLE OF CONTENTS

BACKGROUND ........................................................................................3

STANDARD .............................................................................................6

DISCUSSION ...........................................................................................8

   I.  Respondent Gorter's "Motion to Dismiss Questar Capital Corporation's Improper 'Petition' to Vacate Arbitration Award," (Docket No. 12) .........................................8

       A.  Seeking Vacatur of the Arbitration Award by Petition ..............................9

          1.  The Sixth Circuit and Its Lower Courts Have Used the Titles "Petition" and "Motion" Interchangeably in This Context Without Concern for the Precise Nomenclature or Styling of an Application for Vacatur. ...............................................................................9

          2.  Courts in Other Circuits Have Construed Filings Not Titled "Motion" as Motions to Vacate for Purposes of the FAA. ...............................12

          3.  Other Courts' Reasoning For Requiring That a Filing Be Styled as a "Motion" Is Distinguishable From the Circumstances This Case. .....14

          4.  In Its Discretion, the Court Will Treat Questar's Petition as a Motion to Vacate for Purposes of the FAA. ...........................................17

       B.  Timeliness of Questar's Petition to Vacate .................................18

       C.  Local Rule 7.1(a) ...............................................................23

   II.  Respondent Gorter's "Combined Motion to Dismiss and/or For Summary Judgment on Questar Capital Corporation's Petition to Vacate and Motion to Confirm Arbitration Award" ...............................................................265

   III.  Motions to Confirm and Vacate .............................................27

       A.  Evident Partiality ...............................................................29

          1.  Questar waived its objection to Chairman Stanton's partiality by failing to raise this objection at the arbitration hearing. ...................30

          2.  Even if Questar did not waive its objection to Chairman Stanton, the facts do not support a finding of evident partiality. ...........................37

       B.  Refusing to Hear Evidence Pertinent and Material to the Controversy ....39

          1.  Questar was not denied a fundamentally fair hearing in relation to the testimony of Jason Hargadon. ...........................................42

          2.  Questar was not denied a fundamentally fair hearing in regard to its request that the Panel subpoena more than 50 of Gorter's former clients. ...............................................................................48

       C.  Arbitrators Exceeding or So Imperfectly Executing Their Powers ...........50

       D.  Manifest Disregard for the Law..............................................57

CONCLUSION.......................................................................................60

BACKGROUND

The present action began in this Court upon Questar Capital Corporation's (Questar) Petition to Vacate Arbitration Award.  (Docket No. 1.)  On January 13, 2012, a Financial Industry Regulatory Authority (FINRA) arbitration panel (Panel) issued an award in favor of Thomas J. Gorter (Gorter) following arbitration proceedings that began on August 16, 2011.  After some 31 hearing sessions, the arbitration proceedings closed on December 13, 2011.  Questar filed its Petition to Vacate on February 10, 2012, (Docket No. 1), to which Gorter responded with his Combined Motion to Dismiss and/or for Summary Judgment and Motion to Confirm Arbitration Award, (Docket No. 11), and his Motion to Dismiss Questar's Improper "Petition" to Vacate Arbitration Award, (Docket No. 12), both on March 5, 2012.  Questar responded to both on March 29, (Docket Nos. 22; 23), and Gorter replied on April 13, (Docket Nos. 26; 27).  Questar also filed its Motion to Vacate with accompanying Memorandum of Law on March 29, 2012. (Docket No. 23.)  Gorter responded in opposition to Questar's Motion to Vacate, (Docket No. 28), and Questar replied, (Docket No. 45).  The Court then granted Gorter leave to file a Sur-Reply, which he did on May 29, (Docket No. 52), and also granted Quester leave to file a Response to Sur-Reply, which it did on June 8, 2012, (Docket No. 58).

Throughout their many filings in this matter, the parties continue to dispute the facts of this case and to challenge one another's characterizations of those facts.  This is in no small part due to the fact that the Panel did not issue findings of fact, nor did it

provide an explained decision or opinion along with its award.[1]  At this juncture, much of the contested factual matter is not particularly relevant or necessary given the standard of review for an arbitration award.  Therefore, the following summary is intended for background purposes only and represents no findings of fact by this Court.

Questar is a brokerage firm currently based in Minneapolis, Minnesota, and is a fully owned subsidiary of Allianz Life.  (Docket No. 11-1, at 1.)  Questar is registered with the Securities and Exchange Commission and in 52 states and territories.  (Docket No. 11-1, at 1.)  Questar is also a member of FINRA.  (Docket No. 11-1, at 1.)  Gorter entered into a "Registered Representative's Agreement" (RRA) with Questar on May 21, 2001.  (Docket No. 1-1.)  Then in April 2006, Gorter also entered into an "Investment Advisor Representative Agreement" (IAR Agreement) with Questar Asset Management (QAM).  (Docket No. 23-4.)

In September 2007, the Kentucky Department of Financial Institutions (KDFI) conducted a routine inspection of the Questar branch office where Gorter worked.  (Docket Nos. 11-1, at 2; 23-2, at 2.)  As a result of that investigation, KDFI issued a Statement of Findings indicating that Gorter was acting as a "registered investment advisor" but was not registered as such in Kentucky.  (*See* Docket Nos. 11-1, at 2; 23-2, at 2.)  After the KDFI investigation, it became necessary to transfer Gorter's clients to his supervisor, a registered investment advisor at QAM.  (*See* Docket Nos. 11-1, at 2-3; 23-2,

---

[1] The Panel did not err in this regard, because the arbitration agreement and the FINRA Rules it incorporated do not require an "explained decision" or that the arbitrators provide their rationale for issuing an award unless the parties expressly request it.  *See* FINRA Rule 13904(f) & (g).  This issue, as it relates to the instant motions, will be addressed in greater detail *infra* Part III.C.

at 2.)  According to Questar, "[d]uring the transfer, Gorter altered paperwork on client files."  (Docket No. 23-2, at 2.)  Gorter avers that on January 24, 2008, he resigned from Questar via registered mail, which he argues became effective upon mailing.  (Docket No. 11-1, at 4.)  Questar, on the other hand, maintains that it terminated Gorter on January 25, 2008, the following day.  (Docket No. 23-2, at 2.)  Consistent with this position, Questar reported Gorter had been terminated and its reasons for terminating him on a Uniform Termination Notice for Securities Industry Registration, commonly known as a "Form U-5."  (Docket Nos. 11-1, at 4; 23-2, at 2-3.)

Gorter filed a Statement of Claim against Questar with FINRA in September 2008, alleging breach of contract, negligence, defamation, and tortious interference, and seeking $2,000,000 in actual/compensatory damages and $1,000,000 in exemplary/ punitive damages.  (Docket Nos. 1-3, at 2; 11-1, at 5; 22-17.)  Questar subsequently filed a Statement of Answer and Counterclaim in January 2009, alleging breach of contract and seeking indemnification as well as $10,054,668.53 in actual/compensatory damages. (*See* Docket No. 1-3, at 1, 3.)  Questar filed its Pre-Hearing Brief before the Panel in May 2011, and Gorter his in June 2011.  (Docket No. 1-3, at 2.)  The parties thereafter filed a series of Bench Briefs of Relevant Law as well as various motions, including motions *in limine*, to strike, to compel, and for sanctions, during October and November 2011.  (*See* Docket No. 1-3, at 2.)  The Panel held 31 hearings over 15 days beginning in August and concluding in December 2011.  (*See* Docket No. 1-3, at 6.)  The Panel heard testimony from some 18 witnesses, several of which were expert witnesses, and the parties submitted hundreds of exhibits for the Panel's consideration.  (*See* Docket No. 11-1, at 5.)

The three-arbitrator Panel issues its unanimous award in favor of Gorter in January 2012, exactly one month after the close of the arbitration proceedings. (Docket Nos. 1-3, at 4, 7.)  In that award, the Panel awarded Gorter $3,251,907 in compensatory damages, with interest beginning December 14, 2011, and $49,241 in costs.  (Docket No. 10-3, at 4-5.)  The Panel additionally denied Gorter's request for expungement, Questar's Counterclaim, and any other relief sought by either party, which included punitive damages, attorneys' fees, and sanctions.  (Docket No. 1-3, at 5.)   Then on February 10, 2012, the instant matter began before this Court upon Questar's Petition to Vacate.

STANDARD

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, expresses the federal policy favoring enforcement of arbitration awards.  *See generally Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).  To encourage parties to agree to arbitration, the FAA ensures that "arbitration awards are both fair and final." *Solvay Pharm., Inc. v. Duramed Pharm., Inc.*, 442 F.3d 471, 475 (6th Cir. 2006).  The Act promotes finality "by substantially limiting the occasions for judicial review," *id.*, and expressing a "presumption that arbitration awards will be confirmed."  *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 328 (6th Cir. 1998).   Under the FAA, courts may vacate an arbitration award under the four express statutory grounds in § 10(a)(1)-(4).  And, though accompanied by some uncertainty, *see Hall St. Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008), the Sixth Circuit also recognizes that judicial intervention may be appropriate where arbitrators act with "manifest disregard for the law," *see, e.g.*, *Grain v. Trinity Health*, 551 F.3d 374, 380 (6th Cir. 2008), *cert. denied*, 130 S. Ct. 96 (2009);

*Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415 (6th Cir. 2008), *cert. denied*, 130 S. Ct. 81 (2009).

In light of the policies underlying the FAA, a party seeking vacatur of an arbitration award "must clear a high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 (2010). "When courts are called on to review an arbitrator's decision, the review is very narrow; [it is] one of the narrowest standards of judicial review in all of American jurisprudence." *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 305 (6th Cir. 2008) (alteration in original) (quoting *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005)); *see also NCR Corp. v. Sac-Co., Inc.*, 43 F.3d 1076, 1079 (6th Cir. 1995) (noting that a court's review of an arbitration award "is generally extremely narrow"). Thus, as the U.S. Supreme Court has long held, "the courts play only a limited role when asked to review the decision of an arbitrator," and are not authorized to reconsider the merits of an award. *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987). Stated another way, even "the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce an award." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Misco*, 484 U.S. at 39). Accordingly, as the Sixth Circuit has succinctly instructed, "[C]ourts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious legal or factual error." *Solvay*, 442 F.3d at 476 (alteration in original) (emphasis omitted) (quoting *Misco*, 484 U.S. at 38). In essence, "if a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Id.*

(quoting *Merrill Lynch, Pierce, Fenner & Smith v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).

DISCUSSION

The FAA provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2. Section 6 of the FAA, titled "Application heard as motion," goes on: "Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided."  And in § 10, which addresses vacation of arbitrators' awards, the statute lays out four distinct cases in which a court "may make an order vacating the award upon the application of any party to the arbitration."  § 10(a).  The Court will begin its analysis by addressing Gorter's Motion to Dismiss Questar's Improper "Petition" to Vacate, then proceed to Gorter's Combined Motion to Dismiss and/or for Summary Judgment, and finally conclude by addressing the crux of this matter: whether to confirm or vacate the arbitration award.

I.     **Respondent Gorter's "Motion to Dismiss Questar Capital Corporation's Improper 'Petition' to Vacate Arbitration Award"**

The Court will begin by addressing Gorter's "Motion to Dismiss Questar Capital Corporation's Improper 'Petition' to Vacate Arbitration Award."  (Docket No. 12.)  In that Motion, Gorter divides his argument along two lines: (1) whether Questar's "Petition to

Vacate" was proper under the FAA, and (2) whether Questar timely sought relief under the governing time limitation. The Court will divide its discussion the same.

A.      **Seeking Vacatur of the Arbitration Award by Petition**

Gorter argues that Questar's "Petition to Vacate" is not the proper vehicle for seeking relief under the FAA. (Docket No. 12-1, at 2-4.) As his basis for this argument, he begins by quoting the Eastern District of Pennsylvania's decision in *Interior Finish Contractors Ass'n of Del. Valley v. Drywall Finishers Local Union No. 1955*, in which that court stated: "The statutes and rules do not permit a party to initiate a challenge to an arbitration award by filing a complaint or an 'Application.'" 625 F. Supp. 1233, 1240 (E.D. Pa. 1985). Gorter then proceeds to discuss the Eleventh Circuit's holding in *O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc.*, in which the appellate court addressed the interplay among § 6 of the FAA and Rules 7(b), 8(a), and 81(a)(3) of the Federal Rules of Civil Procedure in the context of the proper procedure for seeking vacatur of an arbitration award. *See* 857 F.2d 742, 744-46 (11th Cir. 1988). Although Gorter's argument is well-taken, after an extensive review of the decisions of the Sixth Circuit and the lower courts therein, as well as of other federal courts around the country, the Court cannot conclude that whatever procedural misstep Questar made by filing a "petition" warrants dismissal. The Court will now discuss its reasons for reaching this conclusion.

1.  **The Sixth Circuit and Its Lower Courts Have Used the Titles "Petition" and "Motion" Interchangeably in This Context Without Concern for the Precise Nomenclature or Styling of an Application for Vacatur.**

After surveying the case law on this issue, the Court finds no controlling precedent in the Sixth Circuit holding that an application for vacating an arbitration

award must be titled "motion" or else be dismissed.  Further, despite the technical differences between "petitions" and "motions," this Circuit has routinely used those terms indistinguishably in cases arising under the FAA.  For example, in *Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the Sixth Circuit employed the two terms interchangeably in discussing the proper procedure for challenging an arbitration award.  *See* 205 F.3d 906, 909-10 (6th Cir. 2000).  There, after arbitration had concluded, the plaintiff filed a complaint in state court asserting various common law tort and contract claims related to the arbitration; however, she did not seek vacatur of the arbitration award under the FAA.  *Id.* at 908.  After being removed to federal court, the defendant moved for dismissal, arguing that the plaintiff's complaint constituted a collateral attack on the arbitration award. The district court agreed and granted dismissal.  *Id.* On appeal, the Sixth Circuit began its analysis by discussing the relevant provisions of the FAA, stating that in the four cases enumerated by § 10(a), "A party may file a *petition* to vacate an arbitration award."  *Id.* at 909 (emphasis added).  Then, in the immediately subsequent paragraphs, the court went on to reason that because the plaintiff chose to collaterally attack the arbitration award, she "should have filed a *motion* for vacatur under § 10 of the Act."  *Id.* at 910 (emphasis added).  Thus, in *Decker* the Sixth Circuit made no effort to distinguish between a "petition" and a "motion" for purposes of seeking vacatur under the FAA.

Decisions by both this District and other district courts in this Circuit have similarly shown little concern over the technical distinction between petitions and motions in this context.  For example, in *Warren v. Tacher*, this Court considered a

"*petition* to confirm in part and to vacate in part" an arbitration award.  114 F. Supp. 2d 600, 600 (2000) (emphasis added).  In addressing whether the petition was time-barred under the FAA, the Court stated: "9 U.S.C. § 12 requires parties to file a *petition* to vacate an arbitration award within 3 months of the final award."  *Id.* at 602 (emphasis added); *accord Fischer v. MBNA Am. Bank, N.A.*, 2005 WL 1168388, *passim* (W.D. Ky. May 17, 2005) (discussing "petitions" to vacate under § 10).    Similarly, in *Myles v. Wolpoff & Abramson, LLP*, the Eastern District of Michigan referenced *Decker*, stating: "A party may file a *petition* to vacate or modify an award . . . under § 10(a) of the FAA." 2008 WL 126620, at *3 (E.D. Mich. Jan. 14, 2008) (citing *Decker*, 205 F.3d at 909)). Other courts in this circuit have likewise applied § 10 of the FAA to filings not titled "motions."  *E.g.*, *Diversified Emp. Solutions, Inc. v. Pawloski*, 790 F. Supp. 2d 655, 656 (N.D. Ohio 2011) (applying §10(a) to an "Application to Vacate Arbitration Award"); *First Family Fin. Servs., Inc. v. Mollett*, 2006 WL 695258, at *2 (E.D. Ky. Mar. 17, 2006) (applying the FAA to a "petition to vacate"); *Conrad Trust v. Morrison*, 2005 WL 2417661 (W.D. Mich. 2005) (applying the FAA to "petitions" to confirm and to vacate, and using the terms "motion" and "petition" interchangeably throughout); *cf. Wells Fargo Advisors, LLC v. Widener*, 2011 WL 6101626, at *1-3 (S.D. Ohio Nov. 9, 2011) (granting petitioner's "Application to Summarily Confirm Arbitration Award" under § 9); *Mercurio v. Am. Express Centurion*, 3363 F. Supp. 2d 936, 936 (N.D. Ohio 2005) (applying  § 9 of the FAA to a "Petition to Confirm Arbitration Award").

Accordingly, the Court finds no controlling precedent to suggest that a filing styled "Petition to Vacate" must be dismissed because of its failure to conform with particulars §§ 6 and 10 of the FAA.

### 2.   Courts in Other Circuits Have Construed Filings Not Titled "Motion" as Motions to Vacate for Purposes of the FAA.

The Court's survey of this issue has revealed a number of cases where courts, in their discretion, have treated variously styled filings as motions to vacate for purposes of the FAA.  For example, in *Health Servs. Mgmt. Corp. v. Hughes*, the Seventh Circuit showed no reservation in treating an "Application to Vacate the Arbitration Award" as a § 10 motion to vacate.  975 F.2d 1253, 1255 (7th Cir. 1992).  There, the petitioner filed an "Application to Vacate" laying out the reasons why the award should be vacated, but did not file an accompanying memorandum of law.  *Id.* at 1256.  On appeal, in addressing whether § 6 of the FAA preempted Fed. R. Civ. P. 16, the Seventh Circuit concluded: "Section 6 preempts the applicability of the Federal Rules and an Application to Vacate is to be treated procedurally in the manner of a motion."  *Id.* at 1258.

Similarly, in *Gimbel v. UBS Fin. Servs., Inc.*, the Northern District of Illinois ruled that the caption "Petition to Vacate Arbitration Award" was not fatal to petitioners seeking vacatur under the FAA.  2009 WL 1904554, at *1, 6-7 (N.D. Ill. May 28, 2009).  The petition filed in *Gimbel* stated the petitioners' factual bases for seeking vacatur under § 10(a) but included no other evidence.  *Id.* at *4, 7.  The respondents, relying on *Kruse v. Sands Bros. & Co.*, 226 F. Supp. 2d 484 (S.D.N.Y. 2002), argued that the petition must be dismissed because it was styled as a "petition" rather than a "motion," and because the

petition was not a motion in substance as required by § 6.  *Id.* at *6.  The court found, however, that the petition "was, in substance, far closer to a motion," concluding:

> Fortunately for the Petitioners, the fact that their Petition came before this Court as a petition, rather than as a motion, to vacate the arbitration award, does not affect the disposition of this case. "The liberality of the . . . Federal Rules is such that an erroneous nomenclature does not prevent the court from recognizing the true nature of a motion."  Accordingly, I accept the Petition and will treat it [a]s a motion to vacate.

*Id.* at *7 (internal citations and quotation marks omitted).

Furthermore, a number of other courts around the country have, in the context of the FAA, either used the terms "petition" and "motion" interchangeably or considered filings not styled as "motions" without issue. *See, e.g.*, *Greenberg v. Bear, Sterns & Co.*, 220 F.3d 22, *passim* (2d Cir. 2000) (using the phrases "petition to vacate" and "motion to vacate" interchangeably in the context of § 10 of the FAA); *Hoffman Printing, Inc. v. Graphic Commc'ns, Int'l Union, Local 261*, 912 F.2d 608, 610-12 (2d Cir. 1990) (applying §§ 9, 10, and 12 to petitioners' "petition to vacate the arbitration award"); *Sonic Auto., Inc. v. Price*, 2011 WL 3564884, at *1 (W.D.N.C. Aug. 12, 2011) (granting "Petition to Vacate the Arbitration Award" under § 10); *Francis v. Landstar Sys. Holdings, Inc.*, 2009 WL 4350250, at * 1-2, 4 (M.D. Fla. Nov. 25, 2009) (using the phrases "petition to vacate" and "motion to vacate" indistinguishably in the context of § 10); *Steiner v. Glenn*, 2002 WL 31133197, at *1 n.1 (N.D. Ill. Sept. 25, 2002) ("[Petitioner] filed a 'complaint' instead of a 'motion,' however, the court treats the complaint as a motion to vacate the arbitration award in accordance to 9 U.S.C. §§ 6,

10(a)."); *Farmers Nat'l Bank of Geneseo v. Van Kampen Merrit, Inc.*, 1992 WL 80516, at *1 (N.D. Ill. April 13, 1992) ("The fact that this motion came before the district court on the application (rather than the motion) of [petitioner] to vacate the arbitration award . . . does not affect our disposition of this case."); *cf. Lobaito v. Chase Bank*, 2012 WL 3104926, at *1, 4-5 (S.D.N.Y. July 31, 2012) (construing a "Complaint" filed by a *pro se* litigant, which the respondent challenged as not even arguing that the award should be vacated, as a motion to vacate for purposes of § 10); *Technologists, Inc. v. Mir's Ltd.*, 725 F. Supp. 2d 120, 121 (D.D.C. 2010) (holding "Petition to Vacate Arbitration Award" and "Cross-Petition to Confirm Arbitration Award" in abeyance pending further briefing on an unrelated procedural issue).

### 3. Other Courts' Reasoning For Requiring That a Filing Be Styled as a "Motion" Is Distinguishable From the Circumstances of This Case.

The reasoning upon which some courts have required that a prayer to vacate an arbitration award be styled specifically as a motion does not support dismissing Questar's Petition here.  A review of the decisions by these courts reveals the principal concern underlying this rationale is the distinction between *motions* and *complaints*.  For example, in *Interior Finish*, the court found that the FAA "does not permit a party to initiate a challenge to an arbitration award by filing a complaint or an 'Application.'"  625 F. Supp. at 1240.  The petitioner there filed four separate documents: an "Application for Vacation of an Arbitration Award," a Complaint, a proposed "Order to Show Cause," and a proposed "Order Vacating the Arbitrator's Award."  *Id.* at 1238.  The "Application," the court reasoned, was not filed as a "motion" as it should have been and was accompanied by "confusing, unnecessary documents, the Complaint and the 'Order to Show Cause.'"

*Id.* at 1240.  The court found after reviewing the record that this mélange of filings sufficiently confused the respondent's counsel as to how and when to respond to each of the various filings; therefore, an entry of default against the respondent was inappropriate.  *Id.*

Taking a similar approach, the Eleventh Circuit in *O.R. Secs., Inc.* held that the proper procedure for seeking vacatur of an arbitration award was to file a "Motion to Vacate" in the district court.  857 F.2d at 746.  There, the petitioner filed a "Complaint and Application."  *Id.* at 744.  The petitioner argued that under the rules of notice pleading, Fed. R. Civ. P. 8(a), it had sufficiently stated a claim for vacating the arbitration award.  *Id.* at 745.  The Eleventh Circuit disagreed, reasoning:

> If, as [the petitioner] contends, the application to vacate the award may be brought in the form of a complaint, then the burden of dismissing the complaint would be on the party defending the arbitration award.  The defending party would be forced to show that the movant could not prove any facts that would entitle him to relief from the arbitration award.  If the defending party did not prevail on its motion to dismiss, the proceeding to vacate the arbitration award would develop into full scale litigation, with the attendant discovery, motions, and perhaps trial.  This is the procedure which [the petitioner] argues the district court should have applied.
>
> We disagree.  It is well-established that "[t]he purpose of the Federal Arbitration Act was to relieve the congestion in the courts and to provide parties with an alternative method for dispute resolution that would be speedier and less costly than litigation." The policy of expedited judicial action expressed in section 6 of the Federal Arbitration Act, 9 U.S.C. § 6, would not be served by permitting parties who have lost in the arbitration process to file a new suit in federal court.

*Id.* at 745-46 (internal citations omitted).  It thus becomes clear the principal concern of courts that have required a "motion" is to distinguish it from a "complaint," because a complaint signifies the commencement of litigation, which the FAA does not intend to accompany the courts' limited review of arbitral awards.

A review of these decisions informs the conclusion that the critical distinction is whether the filing seeking vacatur presents itself as a pleading (*i.e.*, a complaint) or as a motion.  The FAA clearly intends for the proceeding to confirm or vacate an arbitration award to be summary.  *See* 9 U.S.C. § 9; *see generally* 1 Jay E. Grenig, Alternative Dispute Resolution [Alt. Dis. Resol.] § 24:1 (3d ed. 2012).  Accordingly, Fed. R. Civ. P. 81(a)(6)(B) limits the applicability of the Rules where the FAA provides otherwise. Where § 6 of the FAA instructs that applications shall be made and heard in the manner of motions, the clear intent was to remove confirmation and vacatur procedures brought under the FAA from the ambit of pleadings and their attendant rules of civil procedure. The proceedings therefore would not be subject to the rules that apply specifically to pleadings, such as Rules 8 and 12, nor would the rules of discovery apply.  Thus, by requiring applications in the form of motions, the intended summary proceeding to confirm or vacate an award would remain just that, summary.  Further, the burden would remain on the petitioner seeking vacatur to prove that the arbitration award was improper and not shift to the respondent as it would on a defendant filing a motion to dismiss a complaint or for summary judgment.  *See generally* 1 Alt. Disp. Resol. § 24:20.

Therefore, for the reasons discussed more fully below in Part I.A.4, the Court is satisfied that the underlying reasoning why some courts have adhered to a strict styled-as-a-motion requirement does not warrant dismissal of Questar's Petition here.

### 4. In Its Discretion, the Court Will Treat Questar's Petition as a Motion to Vacate for Purposes of the FAA.

Questar's Petition to Vacate consists of some 60-plus paragraphs over 17 pages. (*See* Docket No. 1.)  Attached are exhibits supporting the factual assertions Questar makes.  (*See* Docket Nos. 1-1 to -4.)  On its "Civil Cover Sheet," Questar's brief description of the cause of action reads, "Action to vacate an arbitration award," and cites 9 U.S.C. § 10.  (Docket No. 1-4, at 1.)  The Petition begins, in its first full sentence, "This is an action to vacate the final arbitration award issued by a FINRA arbitration panel . . . on January 13, 2012 . . . ."  (Docket No. 1, at 1.)  In the body of its Petition, Questar states in detail the background facts of this case with reference to the arbitration record and attached exhibits.  (*See* Docket No. 1, at 2-8.)  The Petition also states the specific factual bases upon which relief is sought under § 10(a). [2]  (*See* Docket No. 1, at 1-2, 11-17.)

Like the "Petition to Vacate Arbitration Award" in *Gimbel*, Questar's Petition lays out a coherent, statute- and fact-based argument for vacatur.  *See* 2009 WL 1904554, at *4, 7.  Questar's Petition is wholly distinguishable from the "Counter-Petition to Vacate" in *Kruse*, which consisted of only "nine short paragraphs . . . contain[ing] only

---

[2] The Petition also brings to the Court's attention the fact that the Petition was filed within 30 days of the award and informs the Court that a memorandum of law in support of the Petition would be filed within the three-month period required by § 12 of the FAA.  (Docket No. 1, at 1 n.1.) This issue will be discussed more fully *infra* Part I.B & C in the Court's analysis of the issues of timeliness and Local Rule 7.1(a).

conclusory statements and [was], on the whole devoid of any argument or legal or factual support." 226 F. Supp. at 486. In sum, Questar's Petition, despite not being styled as a "Motion to Vacate," is clear in the relief it seeks and cannot be characterized as a "complaint disguised as a '[Petition] to Vacate.'" *See id.* While it would have been preferable (and less contentious) to have styled its Petition as a "Motion to Vacate," the Court finds Questar's Petition is the substantial equivalent of a motion and, in its discretion, will treat it as such.

### B. Timeliness of Questar's Petition to Vacate

Gorter next asserts that "Questar cannot correct its failure to file a motion to vacate because the time to do so has expired." (Docket No. 12-1, at 4-7.) Gorter argues that while § 12 of the FAA provides a three-month period in which to serve notice of a motion to vacate, "the FAA 'does not prevent the enforcement of agreements to arbitrate under different rules than those stated in the Act itself.'" (Docket No. 12-1, at 4 (quoting *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1393 (D.C. Cir. 1995)).) Gorter submits that Questar signed a Uniform Submission Agreement, (*see* Docket No. 12-3), in which it agreed that the arbitration would be conducted in accordance with the rules of the sponsoring organization, FINRA. (*See* Docket Nos. 12-1, at 5; 12-3.) FINRA Rule 13101, titled "Applicability of Code and Incorporation by Reference," provides that "The Code applies to any dispute that is submitted to arbitration pursuant to Rule[] 13200," which this dispute was. (Docket Nos. 12-1, at 5; 12-4; 12-5.) Further, FINRA Rule 13904, titled "Awards," states in subsection (j), "All monetary awards shall be paid

within 30 days of receipt unless a motion to vacate has been filed with a court of competent jurisdiction." (Docket No. 12-1, at 6.)[3]

According to Gorter, by executing the Uniform Submission Agreement that incorporated FINRA Rule 13904, Questar contractually agreed to shorten the period for filing a motion to vacate the arbitration award to 30 days. (Docket No. 12-1, at 7.) As such, Gorter insists, the 30-day period expired on February 13, 2012, and any properly styled motion to vacate or memorandum of law in support thereof filed after February 13 would be untimely. (*See* Docket Nos. 12-1, at 7; 26, at 6.) In support of this position, Gorter relies heavily on *Aviles v. Charles Schwab & Co.*, where the Southern District of Florida found that by incorporating FINRA Rule 13904, the parties agreed to shorten the time for filing motions to vacate the arbitration award to 30 days. *See* 2010 WL 1433369 at *3 (S.D. Fla. April 9, 2010), *aff'd*, 435 F. App'x 824 (11th Cir. 2011) (per curiam). Questar counters, arguing (1) its Petition was filed within thirty days, (2) "FINRA Rule 13904 governs the time in which to pay an award, absent a notice of filing, and not the time to file a motion to vacate under the [FAA]"; and (3) the portion of the decision in *Aviles* on which Gorter relies was *dicta*, and on appeal the appellate court disregarded it as such.[4] (Docket No. 21, at 4.)

---

[3] Gorter references FINRA Rule 13904 as being attached to his Motion to Dismiss, (Docket 12), as "Exhibit D." However, no Exhibit D for that Motion appears in the Court's docket, and a copy of Rule 13904 does not appear to have been attached as an exhibit to Gorter's contemporaneously submitted "Combined Motion," (Docket No. 11). Nonetheless, the Court has located this Rule in its entirety and is satisfied that the text has not been amended since the underlying arbitration took place. *See* FINRA, *13904. Awards*, http://finra.complinet.com/en/display/display_main.html?rbid= 2403&element_id=4292 (last visited Oct. 25, 2012).

[4] In so far as Questar relies on the January 13, 2012, cover letter attached to the arbitration award, (Docket No. 21-2), as establishing § 12 as the governing limitation period, the Court finds this argument unpersuasive. Aside from having no legal authority whatsoever, the letter offers little help in resolving the timeliness issue. *See generally Aviles*, 2010

After reviewing FINRA Rule 13904, as well as the *Aviles* decision(s) and other relevant decisions, the Court concludes that to the extent Rule 13904 is applicable in this proceeding, it does not represent an agreement by the parties to limit the three-month period provided by § 12 of the FAA.  In *Aviles*, the respondent argued, much as Gorter does, that under Rule 13904, "a party is required to pay an award, or move to vacate an award, within thirty days of receiving the award."  2010 WL 1433369, at *2 (internal quotation marks omitted).  The district court agreed, concluding that the three-month provision in § 12 "did not apply . . . because the first sentence of Rule 13904(j) mandates that a motion to vacate be filed within thirty days of an arbitration award, [thus] any motion to vacate filed thereafter is untimely."  *Id.* at *3.  On appeal, the Eleventh Circuit affirmed the district court's decision without directly addressing the lower court's interpretation of Rule 13904 or deciding the issue of timeliness.  435 F. App'x at 827. The court of appeals acknowledged the district court's conclusion that Rule 13904 established an agreement limiting the time for filing a motion to vacate to 30 days.  *Id.* But, despite that the "parties ha[d] devoted much of their briefs . . . to the timeliness [issue]," the court proceeded to "assume (for the sake of discussion) the district court erred in its conclusion of untimeliness," concluding that "[e]ven assuming timeliness . . . none of the arguments made by [the petitioner] justify vacating the award."  *Id.*

With all due respect to the Middle District of Florida, this Court does not agree that FINRA Rule 13904 establishes a 30-day period for filing a motion to vacate, thereby

---

WL 1433369, at *4 (rejecting petitioner's contention that FINRA cover letter attached to the arbitration award "settled conclusively that [Rule 13904] pertains to the timing of payment only and not to the timing of a motion to vacate").

supplanting the FAA's three-month limit.  The Court agrees with Gorter's premises that the parties agreed to incorporate the FINRA Rules via their Uniform Submission Agreement and that the FINRA Rules apply.  The Court also agrees that parties may agree to a set of rules different than those of the FAA and that "enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).  But, the Court does not agree with Gorter's conclusion that Rule 13904 establishes a 30-day time limit for filing a motion to vacate.  "[T]he plain language of the rule," Gorter contends, "clearly states that payment of the award shall be made in thirty days <u>unless</u> a <u>motion</u> to vacate has been filed."  (Docket No. 26, at 3-4 (emphasis in original).)  A critical reading of that rule and simple logic, however, do not support such a conclusion.  Although the Court has been unable to locate controlling precedent on this point, decisions by courts outside this Circuit directly support the Court's conclusion.

First, in *Prudential-Bache Secs., Inc. v. Tanner*, the First Circuit held that an arbitration rule identical in language to FINRA Rule 13904 did not establish a time limit on motions for vacatur.  72 F.3d 234, 238-39 (1st Cir. 1995).  There, the rule in question was Rule 627(g) of the Rules of the New York Stock Exchange (NYSE), which read, in identical fashion to FINRA Rule 13904: "All monetary awards shall be paid within thirty (30) days of receipt unless a motion to vacate has been filed with a court of competent jurisdiction."  *Id.* at 238 n.2.  The respondents argued that NYSE Rule 627(g) established a 30-day period for filing motions to vacate, reasoning that "Rule 627(g), by requiring payment of the award within 30 days of its receipt if a motion to vacate has not been

filed, compels the conclusion that any challenge to an arbitration award must be filed within the same time period." *Id.* at 238.  The First Circuit disagreed:

> [Respondents] seek to find a time limit in Rule 627(g) that it does not include. . . . [T]hey cannot escape the fact that the text of the Rule is clear.  As stated by the court below, "[t]he plain language of Rule 627(g) . . . does not even address the question of a time limitation on motions for vacatur, but rather establishes when awards are to be paid and the precise moment at which interest begins to accrue on unpaid amounts of an award."  We are unwilling to read a time limit into its language.
>
> In contrast, the text of Section 12 [of the FAA] is unambiguous, clearly setting out a 90-day time limit.  Since the Rules of the NYSE provide no time limit, we find that the FAA 90-day provision applies . . . ."

*Id.* at 238-39 (citations omitted).

The Southern District of New York's decision in *Kruse* further supports the Court's conclusion here.  *See* 226 F. Supp. 2d at 485, 487.  There, the court began by reciting National Association of Securities Dealers (NASD) Rule 10330[5]: "[A]ll monetary awards shall be paid within thirty (30) days of receipt unless a motion to vacate has been filed with a court of competent jurisdiction."  *Id.* at 485.  The primary issue in *Kruse* was whether the respondents' "Cross-Petition to Vacate" was the legal equivalent of a "motion to vacate."  *See id.* at 485-87.  However, despite applying NASD Rule 10330 to determine postaward interest, the court applied § 12 of the FAA to determine the

---

[5] FINRA succeeded the NASD in 2007.  *See* Press Release, FINRA, NASD and NYSE Member Regulation Combine to Form the Financial Industry Regulatory Authority–FINRA (July 30, 2007), *available at* http://www.finra.org/Newsroom/NewsReleases/2007/p036329.  Thereafter, NASD Rule 10330(h) was replaced by FINRA Rule 13904(j) with only minor changes, none of which are relevant to this analysis.

time limit for filing a motion to vacate.  *Id.* at 487-88  Thus, the court did not consider NASD Rule 10330 as establishing a time limit for filing motions.  *See id.*

Therefore, the Court finds that FINRA Rule 13904 does not establish a 30-day time limit for filing a motion to vacate.  As the First Circuit concluded in *Prudential-Bache*, the plain language of that Rule does not address the question of time limitations for motions to vacate in any way.  Rather, it appears as the last of ten subsections under a rule titled "Awards," and its clear purpose is to establish when awards are paid and when interest begins to accrue on unpaid awards.   Logically, the Court cannot read the Rule's language that "all monetary awards must be paid within thirty days unless a motion to vacate has been filed" as meaning "a motion to vacate must be filed within thirty days" or that "a motion to vacate must be filed within thirty days if an award has not been paid." Therefore, the correct measure of timeliness for purposes of this proceeding is that of 9 U.S.C. § 12:  "three months after the award is filed or delivered."  Because Questar's Petition to Vacate and subsequently filed Memorandum of Law both fall within § 12's limitation period, the Court finds both were timely for purposes of the FAA.

### C.      Local Rule 7.1(a)

As a final threshold matter, Gorter challenges Questar's decision not to attach a memorandum of law in support of its Petition to Vacate.  (*See* Docket No. 12-1, at 4.) Gorter argues that because Rule 7.1(a) of the Joint Local Rules of Civil Procedure for the Eastern and Western Districts of Kentucky requires that "each motion 'must be accompanied by a supporting memorandum,'" Questar's Petition cannot be treated as a motion to which Gorter must respond.  (Docket No. 12-1, at 4.)   However, Local Rule

7.1(a) goes on, "Failure to file a supporting memorandum *may* be grounds for denying the motion." LR 7.1(a) (emphasis added).  Therefore, it is inaccurate to say Local Rule 7.1(a) necessarily *requires* denial of a motion submitted without an accompanying memorandum of law.  *See Carver v. Bunch*, 946 F.2d 451, 453 (6th Cir. 1991) (interpreting a similarly worded Kentucky Local Rule to conclude that "[t]he use of the word 'may' as opposed to 'will,' . . . implies that the district court has discretion" in enforcing the rule); *see also Neogen Corp. v. U.S. Dep't of Justice*, 2006 WL 3422691, at *2 n.2 (E.D. Ky. Nov. 28, 2006) (finding lack of strict compliance with LR 7.1(a) excusable and declining to strictly enforce its accompanying-memorandum requirement where to do so would "unnecessarily place form over substance"); *Blair v. Fullbach Servs. Inc.*, 1999 WL 33756627, at *1 (W.D. Ky. Nov. 1, 1999) (considering, in its discretion, the merits of a tardy responsive brief under LR 7.1(c)); *cf. Contech Const. Prods. v. Heierli*, 764 F. Supp. 2d 96, 106 (D.D.C. 2011) (declining, in its discretion, to enforce a local rule and dismiss a petition to vacate unaccompanied by a memorandum of authorities where the court found that respondent was not prejudiced given that the petition adequately set forth the grounds on which the award was being challenged).

Questar filed its Memorandum of Law in Support of the Petition to Vacate Arbitration Award and/or Motion to Vacate with Incorporated Memorandum of Law (Questar's Memorandum) on March 29, 2012.  (Docket No. 23-2.)  For the reasons discussed *supra* Part I.B, this filing remains timely for purposes of § 12 of the FAA.  Furthermore, to the extent Gorter argues he could not effectively respond or know how to respond to Questar's Petition (*à la* the confused respondent in *Interior Finish*, 625 F.

Supp. at 1238-40), this argument is untenable.  Questar's Petition makes clear its purpose of seeking vacatur under § 10 of the FAA and alerts both the Court and Gorter in ¶ 1 on the first page that Questar would be filing a supporting memorandum within § 12's three-month period.  (*See* Docket No. 1, at 1 & n.1.)  Moreover, Gorter has abundantly responded to both the substance and form of Questar's original Petition and its subsequently submitted Memorandum.  (*See* Docket Nos. 11; 12; 26; 27; 28; 52.) Therefore, the Court finds no reason not to consider Questar's March 29 Memorandum of Law and, in its discretion, declines to dismiss or deny Questar's Petition to Vacate on the basis of LR 7.1(a).

*  *  *  *  *

For the foregoing reasons, Gorter's "Motion to Dismiss Questar Capital Corporation's Improper 'Petition' to Vacate Arbitration Award," (Docket No. 12) is DENIED.

## II.    Respondent Gorter's "Combined Motion to Dismiss and/or For Summary Judgment on Questar Capital Corporation's Petition to Vacate and Motion to Confirm Arbitration Award"

The Court turns next to Gorter's Combined Motion to Dismiss and/or for Summary Judgment; the Court at this time does not address the portion of Gorter's Motion that seeks to confirm the arbitration award, but will do so *infra* Part III of this Opinion.  (*See* Docket No. 11.)  As discussed *supra* Part I.A.3, Fed. R. Civ. P. 81(a)(6)(B) provides that the Rules govern, "except as [9 U.S.C.] provide[s] other procedures."  Title 9 does not "provide other procedures" expressly to govern summary judgment, but does instruct more generally under § 6 that "[a]ny application to the court

hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided."   The Court has located no express controlling authority on whether the FAA preempts Rule 56 or whether summary judgment is an appropriate vehicle for seeking relief in the context of judicial review of an arbitration award.  *See ISC Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 113 (2d Cir. 2012) (questioning, without deciding, whether the FAA preempts Rule 56); *id.* at 122-23 (Straub, J., dissenting) (arguing that the FAA does not preempt Rule 56); *cf. Wachovia Sec., Inc. v. Gangale*, 125 F. App'x 671, 672, 674-75 (6th Cir. 2005) (affirming, without directly addressing whether the FAA preempts Rule 56, a grant of summary judgment which sought confirmation of an arbitration award under the FAA).  However, the FAA does clearly provide procedures for the relief available upon judicial review: namely, courts are limited to (1) confirming, (2) vacating, or (3) modifying or correcting an award.  *See* §§ 9-11.  These limited judicial options are consistent with the policy "that courts should play only a limited role in reviewing the decisions of arbitrators."  *Shelby Cnty. Health Care Corp. v. Am. Fed'n of State, Cnty. & Mun. Emps., Local 1733*, 967 F.2d 1091, 1094 (6th Cir. 1992).

Here, despite its styling as a "Combined Motion to Dismiss and/or for Summary Judgment . . . and Motion to Confirm Arbitration Award," Gorter's Motion effectively seeks to respond to Questar's Petition to Vacate and in turn move for confirmation of the award.  (*See* Docket No. 11.)  Therefore, the Court will construe it only as a motion to confirm the arbitration award and, for the reasons discussed *infra* Part III, will DENY

that part of Gorter's Combined Motion that seeks dismissal and/or summary judgment as moot.

## III.    Motions to Confirm and Vacate

Turning now to the heart of this proceeding, the Court presently has before it a mass of filings, variously styled, in which the parties have exhaustively argued for the respective relief each seeks.  As such, the ultimate issue before the Court is whether to confirm or vacate the arbitration award underlying this proceeding.  Accordingly, the Court turns now to the merits of Questar's application for vacatur and Gorter's application for confirmation, which the Court finds may be addressed simultaneously.

The Sixth Circuit interprets §§ 9 and 10 of the FAA as making clear that confirmation or vacatur is to be a summary proceeding, "and [that] the court *must* confirm the award where it is not vacated, modified or corrected."  *Gangale*, 125 F. App'x at 676.  The Sixth Circuit outlines the court's role in reviewing an arbitration award as follows:

> [T]he plain language of the [FAA] presumes that arbitration awards will be confirmed, and out limited role in confirming an arbitration award under the [FAA] is well settled.  The parties have contracted for a decision by the arbitrators, not the Court.  The standard for judicial review of arbitration procedures is merely whether a party to arbitration has been denied a fundamentally fair hearing. Accordingly, neither the trial court nor [this court of appeals] may reconsider the merits of an award, even when parties allege that the award rests on errors of fact . . . .  As a matter of law, the federal courts are merely courts of enforcement where the award has not been vacated, modified or corrected.

*Id.* (citations omitted).  Under the FAA, an arbitration award may be vacated on any of the following statutory grounds:

1. where the award was procured by corruption, fraud, or undue means;

2. where there was evident partiality or corruption in the arbitrators, or either of them;

3. where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

4. where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).   The United States Supreme Court has expressly held that § 10 "provide[s] the FAA's exclusive grounds for expedited vacatur."   *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008).   However, even in light of *Hall*, the Sixth Circuit continues to recognize that an award may also be vacated where found to be in "manifest disregard of the law." *E.g. Grain v. Trinity Health*, 551 F.3d 374, 380 (6th Cir. 2008), *cert. denied*, 130 S. Ct. 96 (2009); *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415 (6th Cir. 2008), *cert. denied*, 130 S. Ct. 81 (2009).

Questar argues that vacatur is warranted under § 10(a)(2)-(4),[6] as well as on the basis of "manifest disregard of the law."   The Court has considered the entirety of the parties' submissions, including Questar's Petition, (Docket No. 1), and Memorandum of Law, (Docket No. 23-2); Gorter's Combined Motion and Memorandum in support thereof, (Docket Nos. 11; 11-1); the parties exhaustive Responses, Replies, Sur-Replies,

---

[6] Questar only vaguely and in passing alleges that the arbitration award was procured by fraud or undue means under § 10(a)(1).   (*See* Docket No. 23-2, at 1, 24.)   This argument is not developed further, however, and so will not be addressed here beyond to conclude that Questar has not established that vacatur is warranted under § 10(a)(1).

Responses to Sur-Replies, and the multitude of exhibits attached thereto (*e.g.*, Docket Nos. 22; 27; 28; 45; 52; 58); and the voluminous arbitration record, which the Court permitted the parties to physically submit to chambers. [7]   Based on its review and consideration of these submissions and the parties' arguments, and for the reasons set forth below, the Court finds that vacatur is not warranted and that the award must be confirmed.   The Court will now address in detail the parties' respective arguments why the award should be vacated or confirmed.

### A.   Evident Partiality

Questar argues that vacatur is warranted, pursuant to § 10(a)(2), because of the evident partiality of one of the arbitrators, Chairman David Stanton (Stanton or Chairman Stanton).   In this regard, Questar argues essentially three points that it suggests establish evident partiality: (1) that Stanton breached his duty to investigate and disclose a potential conflict of interest, (2) that Stanton's eventual disclosure did not remedy that breach, and (3) that the manner of Stanton's disclosure did not provide Questar a meaningful opportunity to object or to challenge him.   (*See* Docket No. 23-2, at 3-10.) Despite accurately identifying the Sixth Circuit's standard for evident partiality laid out in *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344 (6th Cir. 1989), and *Andersons Inc. v. Horton Farms, Inc.*, 166 F.3d 308   (6th Cir. 1998), [8] Questar interposes the standard

---

[7] Because there is a tremendous amount of overlap and repetition in the parties' arguments across their many responsive filings, any citation or reference to the record regarding a party's argument should not be construed as the Court not considering other related arguments presented in separate or subsequent filings.   As just stated, the Court has considered and bases its decision on the entirety of the parties' arguments as presented in all outstanding filings.

[8] In its Memorandum of Law, (Docket No. 23-2, at 3-4), Questar accurately identifies the correct standard in the Sixth Circuit; however, the Court notes that in its responsive filing to Gorter's Combined Motion, which was filed the same day, Questar incorrectly suggests that "[t]he standard for evident partiality is not whether the arbitrator believes he has no conflict of interest but rather, whether a significant prior relationship might convey a 'reasonable impression' of partiality, (Docket No. 22, at 7 (citing *Positive Software*, 476 F.3d at 280-81).)   The "reasonable impression" or

apparently used by other circuits in arguing that Stanton's actions conveyed a "reasonable impression" of partiality.  (*See* Docket No. 23-2, at 3-4, 8, 10 (citing *Schmitz v. Zilveti*, 20 F.3d 1043, 1048 (9th Cir. 1994); *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 280-81 (5th Cir. 2007)).)  Gorter responds, arguing that (1) Questar waived any objection to Stanton's partiality, and (2) even if it did not, neither the facts from the arbitration nor the authorities relied on by Questar support a finding of evident partiality.  (*See* Docket No. 28, at 12-17.)  The Court agrees with both of Gorter's arguments on this issue.  Accordingly, the Court finds that Questar waived it objection to Stanton's partiality by failing to raise that objection at the hearing and, even if it did not, has nonetheless failed to establish evident partiality under the law of this Circuit.

### 1.  Questar waived its objection to Chairman Stanton's partiality by failing to raise this objection at the arbitration hearing.

The Sixth Circuit has held that "as a general rule, a grievant must object to an arbitrator's partiality at the arbitration hearing before such an objection will be considered by the federal courts."  *Apperson*, 879 F.2d at 1358-59; *see also Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 746 (6th Cir. 1985) (finding waiver where a party failed to object to the partiality of arbitrators at the arbitration hearing); *Early v. E. Transfer*, 699 F.2d 552, 558 (6th Cir. 1983) (stating it "is an accepted rule in arbitration cases" that courts will not hear a claim of bias that was not raised at the hearing in which the bias is alleged); *accord Delta Mine*

---

"appearance of bias" standard has been expressly rejected and is not the controlling standard in this Circuit.  *See e.g.*, *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 306-07 (6th Cir. 2008); *Andersons*, 166 F.3d at 325; *Apperson*, 879 F.2d at 1358.

*Holding Co. v. AFC Coal Props, Inc.*, 280 F.3d 815, 821 (8th Cir. 2001) (concluding that "when a neutral arbitrator is challenged for evident partiality, the issue is deemed waived unless the objecting party raised it at the arbitration panel").  Still, the failure to object may not be fatal to the aggrieved party's claim unless "[a]ll the facts now argued as to [the arbitrator's] alleged bias were known . . . at the time [of the arbitration]."  *Early*, 699 F.2d at 558; *accord United Steelworkers of Am. Local 1913 v. Union R.R. Co.*, 648 F.2d 905, 913 (3d Cir. 1981) (finding failure to object fatal to a claim of bias "[w]hen the reasons supporting an objection are known beforehand").

Gorter argues that Questar waived its objection to Stanton's continued service as an arbitrator by failing to object when Stanton disclosed his connection to the Local 2100 IBEW, a union that Gorter helped to found.  (*See* Docket No. 28, at 17-18.)  Gorter further refutes the notion that Stanton's disclosure, which was accompanied by his statement that he did not believe that connection would affect his impartiality, had any "coercive" or "chilling" effect on Questar's ability to object.  To this end, Gorter offers two points: (1) that Questar "had already once exercised an objection to remove an arbitrator," and (2) that Questar's attorney "specifically stated Mr. Stanton's disclosure was 'no problem.'"  (Docket No. 28, at 18.)  Questar, on the other hand, argues Stanton "unduly delay[ed] disclosure of his connection with Local 2100 IBEW" and did not "provid[e] Questar a meaningful opportunity to challenge . . . that [Stanton's] ties to Local 2100 IBEW presented no conflict."  (Docket No. 22, at 5.)  Questar goes on:

> It was only after [Stanton] had already stated his conclusion that he believed there was no conflict, that [he] then asked whether there were any objections to it.  Thus, Chairman Stanton's failure

to disclose his conflict in the appropriate time and manner deprived Questar of a meaningful opportunity to object. . . .

The Chairman's repeated statements that he did not believe his connection to Local 2100 IBEW would impair his ability to remain impartial were coercive and chilled the exercise of any challenge to the Chairman, who obviously had made up  his mind on the issue of conflict. . . . Questar's decision to continue with the arbitration was not a waiver because, under the circumstances, any challenge to the Chairman would have been a futile act.

(Docket No. 22, at 5-6.)  Questar makes much of the fact that in his opening statement Gorter's counsel stated:  "Gorter . . . started out as a laborer. . . . So a lot of his clients are old union guys and their family and friends."  (*See, e.g.*, Docket No. 23-2, at 7.)  This statement, Questar maintains, establishes that Stanton had constructive notice of a potential conflict at the outset of the proceeding, thus underscoring the untimeliness of his later disclosure.

After reviewing the relevant portions of the transcript, specifically Stanton's disclosure and the colloquy between Stanton and the parties at that time (excerpted below), the Court finds little support for Questar's position on this issue.

[Direct Examination of one of Gorter's former clients by Gorter's counsel]
Q.  How did you come to be Mr. Gorter's client?
A.  Got introduced through the union, but I knew him when he worked at the gas company, too, knew of him working on the same job si[t]e.
. . .
CHAIRMAN STANTON:  Mr. Schafers, let me interrupt you.  You just indicated at one time you held a union job, is that correct?
THE WITNESS:  Yes, sir.

CHAIRMAN STANTON:  May I ask you, sir, what union that was with?

THE WITNESS:  Local 2100 IBEW for local gas electric.

CHAIRMAN STANTON:  Randy Klinglesmith and those guys[?]

THE WITNESS:  Gary Klinglesmith.

CHAIRMAN STANTON:  I have done arbitrations in a labor management setting with Louisville Gas & Electric and IBEW.  I don't ever recall having any cases or any matters with you sir.

THE WITNESS:  No, I have never had an arbitration so I would say not.

CHAIRMAN STANTON:  Once I heard that, you mentioned I think you did say the gas company, I thought I should let the parties be aware of that.  Again, it's one of those disclosures that I think has to be made.  Kind of inadvertent since we don't know what is going to be here, what they are going to testify about and what their histories are.

**Again, I don't believe that will impair my ability in any way to discharge my duties in this proceeding.**

**Mr. Cosgrove [counsel for Gorter], is that disclosure acceptable?**

**MR. COSGROVE: Yes, sir.**

**CHAIRMAN STANTON:  Mr. Taylor [counsel for Questar]?**

**MR. TAYLOR:  It is.**

(Docket No. 11-3, at 21-23; Tr. of Evid., at 1805:21-1807:13 (emphasis added).)

* * *

CHAIRMAN STANTON:  At the beginning of this proceeding in opening statements I believe you indicated that Mr. Gorter built his book of business through various union clients, and for the sake of getting into the same disclosure issue, are they predominantly with Louisville Gas & Electric employees, IBEW?  Mr. Gorter, I'm trying to get a clarification.

MR. COSGROVE:  Is that the union you are in?

MR. GORTER:  That was the union I was in and helped start.

CHAIRMAN STANTON:  You were also in that union?

MR. GORTER:  Yes, sir.

CHAIRMAN STANTON:  Union clients never was elaborated upon, and again for the purposes of this proceeding, I don't recall ever having any matters with you personally.  Correct me if I'm wrong, after 2,000 plus cases, I can't keep everybody straight.  I do not believe that to be the case.

MR. GORTER:  No.  I left, I left Louisville Gas & Electric, gosh, back in '70 something after I had that injury and the union started.

CHAIRMAN STANTON:  I recall remotely about that but not vividly, and I just want to make sure that is all in the record.

Are there other individuals here today, the affiants that are going to be in that same relationship with you, Mr. Gorter?

MR. GORTER:  Danny Williamson worked at Louisville Gas & Electric also, but he is the only one today, and it was a mix.

CHAIRMAN STANTON:  To the extent I may see a face and recognize someone.  If that is the case, I will make the same disclosure again when he mentions that just so the record is clear.  Again, I don't believe it has any impact at all on my ability to discharge my duties in this proceeding, but I want to be fair to everyone here that once it became clear that there is the labor organization we are talking about and the process of you building your business, I have done work with them over the last 20 plus years.  So.

**MR. TAYLOR:  Do you represent the union?**

**CHAIRMAN STANTON:  No, not at all.  I'm the arbitrator.**

**MR. TAYLOR:  That is what I thought.**

(Docket No. 11-3, at 25-27; Tr. of Evid., at 1816:24-1818:24 (emphasis added).)

* * *

CHAIRMAN STANTON:  [To the Witness] It's my guess you probably haven't been in a proceeding like this before, is that a fair statement?

THE WITNESS:  A proceeding like this, an arbitration?  I have been in arbitrations.

CHAIRMAN STANTON:  You have been in arbitrations before with the IBEW Local 2100?

THE WITNESS:  That is correct.

. . . .

CHAIRMAN STANTON:  Sir, I am the labor arbitrator and I have done work with the Louisville Gas & Electric Company and the IBEW with Bill Noyse and Gary Klinglesmith.

THE WITNESS:  Very familiar.

CHAIRMAN STANTON:  I don't recall having any proceedings with you.

THE WITNESS:  I don't either. . . . I think the arbitration itself concerned a grievant by the name of Reeser.

CHAIRMAN STANTON:  I don't recall ever having anything.  It's my obligation in this proceeding to these parties to disclose those matters.  I understand your relationship with Mr. Gorter who is a party in these proceedings through your relationship with him at Louisville Gas & Electric Company.

THE WITNESS:  Yes.

CHAIRMAN STANTON:  It's my obligation to advise the parties here that at some point in my other career, that is still ongoing, but outside of these types of proceedings, I have in fact worked with those parties and with the IBEW, Local 2100.

**Again, for the record's sake, I do not believe that that would impair my ability to proceed.**

MR. COSGROVE:  Claimant still finds the composition of the panel acceptable.

**CHAIRMAN STANTON:  Mr. Taylor[?]**

**MR. TAYLOR: Yes, sir.  No problem.**

(Tr. of Evid., at 1820:21-1823:3; Docket No. 11-3, at 28-29 (reflecting only Tr. of Evid. pp. 1822-23) (emphasis added).)

The Court's review of this transcript and the colloquy that took place between Stanton and the parties' counsel in no way impresses the Court that Stanton's disclosure was "coercive" or "chilling" as Questar suggests.  What the transcript does show is that neither party expressed any concern during the proceeding as to Stanton's continued

service as an arbitrator.  Further, the Court finds no reason to conclude that the facts now being used to argue Stanton's bias were not known to Questar or its counsel at the time of the arbitration proceeding.  *See Early*, 699 F.2d at 558.  Counsel for Questar became aware that Stanton had served as a neutral arbitrator for disputes involving the Local 2100 IBEW upon Stanton's disclosure on the record on November 10, 2011.  The transcript shows that with knowledge of this fact, counsel for Questar not only failed to object to any potential partiality on Stanton's part but in fact agreed multiple times, both before and after a recess in the hearing, to Stanton's continued service on the panel.  (*See* Tr. of Evid., at 1807, 1819 (recess taken), 1823.)  Moreover, the arbitration hearings did not close until December 13, 2011, and the panel did not issue its award until January 13, 2012—yet Questar raised its objection to Stanton's partiality and potential conflict of interest for the first time in its Petition to Vacate filed in this Court.[9]

The Court does not disregard the challenges attendant to pursuing disqualification of an arbitrator in the midst of an arbitration proceeding.  Nor does the Court speculate whether a request to dismiss Stanton would have been granted at the hearing.  But, as the Eastern District of Michigan aptly put it in *Thomas Kinkade Co. v. Lighthouse Galleries, LLC*, "[although] a party that seeks to disqualify an arbitrator after commencement of the hearing faces an uphill battle. . . . Nonetheless, [that party] had to make an objection if they wished to preserve the issue for review, even at the risk of contributing to [the arbitrator's] disfavor of their cause."  2010 WL 436604, at *7 (E.D. Mich. Jan. 27, 2010),

---

[9] This is not to suggest that Questar was required to lodge a formal objection between the close of arbitration proceedings and the issuance of the award, as the Court has found no authority specifically to suggest such a requirement.  However, Questar's failure to lodge such an objection, in light of its express assent to Stanton's continued service at the hearing, weighs decidedly in favor of finding that Questar waived any objection to Stanton's partiality.

*and reconsideration denied*, 2010 WL 1626697 (Apr. 21, 2010).  Put another way, a party cannot remain silent as to perceived or actual partiality or bias and then later object after the panel reaches an unfavorable decision.  *See generally Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 151 (White, J., concurring) ("The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality.  That role is best consigned to the parties, who are the architects of their own arbitration process . . . .").  Accordingly, the Court finds that Questar waived its objection to Chairman Stanton's partiality by failing to raise that objection during the arbitration proceeding despite having all the facts now argued available to it at that time.

### 2.   Even if Questar did not waive its objection to Chairman Stanton, the facts do not support a finding of evident partiality.

In the Sixth Circuit, "evident partiality will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Apperson*, 879 F.2d at 1358 (internal quotation marks omitted).  This standard does not require proof of actual bias, but does require more than an "appearance of bias."  *See id.*; *Andersons*, 166 F.3d at 325.  "It is not enough to demonstrate an amorphous institutional predisposition toward the other side, because that would simply be the appearance-of-bias standard that [the Sixth Circuit] ha[s] previously rejected."  *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 306-07 (6th Cir. 2008) (citation and internal quotation marks omitted).  Instead, a party must establish "specific facts that indicate improper motives on the part of the arbitrator."  *Id.* (citation and internal quotation marks omitted).

Questar's principal claim as to Stanton's partiality toward Gorter is that Stanton failed to disclose the fact that he had arbitrated cases in which Gorter's former union, the Local 2100 IBEW, was a party.  This failure, Questar insists, buttressed by "[a] number of clear instances . . . including limits on cross-examination, limits on evidence, reliance on a contract not attached to the Statement of Claim, and other errors . . . intolerably compromised the integrity of the Gorter Arbitration proceedings and conveyed a 'reasonable impression' of partiality."  (Docket No. 23-2, at 10.)  Despite that "reasonable impression" is not the standard in this circuit, *see supra* Part III.A, Questar offers, in effect, no more than an amorphous proposition that Stanton was partial toward Gorter. Regardless whether Stanton's relationship with the Local 2100 IBEW was the "trivial" sort that requires no disclosure, *see, e.g.*, *Commonwealth*,  393 U.S. at 150 (White, J., concurring); *Uhl*, 512 F.3d at 307, Questar has established no specific facts showing that Stanton had an improper motive, such as a longstanding and ongoing relationship with Gorter or a financial interest in the outcome of the proceedings.  *See Uhl v. Komatsu Forklift Co.*, 466 F. Supp. 2d 899, 906-07 (E.D. Mich. 2006) (finding no evident partiality where there was no evidence of an ongoing business relationship or that arbitrator had a financial interest in the outcome of the arbitration, in spite of the fact that arbitrator and counsel for one of the parties had past dealings in a prior litigation), *aff'd*, 512 F.3d at 307-08.  Stanton disclosed serving as a *neutral arbitrator* for matters in which the Local 2100 IBEW was a party over some 20-plus years; but, he averred that he did not represent the Local 2100 IBEW.  Moreover, Gorter's direct involvement with that union ceased more than 30 years ago.  Assuming, without deciding, that Stanton did breach a duty to

disclose his connection to the union and that his mid-arbitration disclosure did not remedy that breach, Questar nonetheless has failed to establish why this connection would lead a reasonable person to conclude that Stanton was partial to Gorter. The fact that the Panel ruled against Questar does not establish that they did so because of Stanton's improper motives and, thus, provides no evidence of evident partiality. *See, e.g.*, *Urban Assocs., Inc. v. Standex Elecs., Inc.*, 2012 WL 1079723, at *10 (E.D. Mich. Feb. 17, 2012), *adopted by* 2012 WL 1079720 (E.D. Mich. Mar. 30, 2012). Accordingly, the Court "will not rush to conclude that an arbitrator is evidently partial." *Uhl*, 512 F.3d at 308.

* * * * *

For these reasons, the Court concludes that Questar waived its objection to Chairman Stanton's partiality by failing to raise that objection during the arbitration proceeding despite having all the facts now argued available to it then; but, even if Questar did not waive its objection to Chairman Stanton, it still has failed to establish evident partiality on Stanton's part. Therefore, vacatur is not warranted under 9 U.S.C. § 10(a)(2).

### B.      Refusing to Hear Evidence Pertinent and Material to the Controversy

Questar next contends that the award should be vacated because the Panel refused to hear pertinent and material evidence, and because the Panel prevented Questar from offering witness testimony from a number of Gorter's former clients. It is well established in this Circuit that "[a]rbitrators are not bound by formal rules of procedure and evidence, and the standard for judicial review of arbitration procedures is merely

whether a party to arbitration has been denied a fundamentally fair hearing." *Barrick Enters., Inc. v. Crescent Petro., Inc.*, 2012 WL 3668006, at *6 (6th Cir. Aug. 27, 2012) (alteration in original) (quoting *Nat'l Post Office Mailhandlers v. U.S. Postal Serv.*, 751 F.2d 834, 841 (6th Cir. 1984)); *accord Dobson Indus., Inc. v. Iron Workers Local Union No. 25*, 237 F. App'x 39, 48 (6th Cir. 2007); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 625 (6th Cir. 2002). Arbitrators are "expected to act affirmatively and to simplify and expedite the proceedings before [them]." *Urban Assocs.*, 2012 WL 1079723, at *11 (alteration in original) (quoting *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1022 (5th Cir. 1990)). "Arbitrators are not bound to hear all the evidence tendered by the parties; they need only afford each party the opportunity to present their arguments and evidence." *Urban Assocs.*, 2012 WL 1079720, at *4 (quoting *Terk Techs. Corp. v. Dockery*, 86 F. Supp. 2d 706, 709 (E.D. Mich. 2000)). Accordingly, not every failure to receive evidence constitutes misconduct under § 10(a)(3); instead, the question is simply whether a party was deprived of a fundamentally fair proceeding. *See Urban Assocs.*, 2012 WL 1079723, at *11 (referencing *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 557 (3d Cir. 2009); *Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 287 (S.D.N.Y. 2007)). Thus, where arbitrators refuse to hear certain evidence, a petitioner must show that the excluded evidence was material to the arbitrators' determination and that the refusal to hear that evidence was so prejudicial that the party was denied fundamental fairness. *Warren v. Tacher*, 114 F. Supp. 2d 600, 602 (W.D. Ky. 2000). The standard for the Court's review of whether the arbitrators' decision constituted "misconduct" under § 10(a)(3) is "abuse of discretion." *Floyd Cnty.*

*Bd. of Educ. v. EUA Cogenex Corp.*, 198 F.3d 245, 1999 WL 1023704, at *2 (6th Cir. 1999) (unpublished table decision) (citing *Schmidt v. Finberg*, 942 F.2d 1571, 1573 (11th Cir. 1991)).  "To meet this standard, the party seeking to vacate the arbitration award must prove by clear and convincing evidence that the arbitrator had no reasonable basis for his decision."  *Id.* (citing, *e.g.*, *In re Time Constr., Inc.*, 43 F.3d 1041 (6th Cir. 1995)).

Questar's arguments in regard to the Panel's refusal to hear material and pertinent evidence under § 10(a)(3) are presented in such a way as to blur the line between this issue and those of whether the arbitrators exceeded or imperfectly executed their powers (under § 10(a)(4)) or based their award on a "manifest disregard of the law" (under this Circuit's precedent, *e.g.*, *Grain v. Trinity Health*, 551 F.3d 374 (6th Cir. 2008); *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415 (6th Cir. 2008)).  Under this heading, the Court reads four basic contentions by Questar: (1) that the Panel improperly considered the IAR Agreement; (2) that the Panel ignored critical facts and/or improperly considered the evidence, including Gorter's expert's testimony and Gorter's own testimony regarding the sale of his book of business, in calculating its award for damages; (3) that despite allowing Gorter to introduce evidence through the testimony of his attorney, Jason Hargadon (Hargadon), the Panel improperly allowed Hargadon to assert the attorney-client privilege on Questar's cross-examination; and (4) that the Panel improperly excluded testimony from Gorter's former clients.[10]  However, only the latter two appear to fall appropriately within § 10(a)(3)'s purview of "refusing to hear evidence pertinent

---

[10] Questar raises an additional claim that it was deprived a fundamentally fair hearing due to issues involving Chairman Stanton's non- or late disclosure and potential bias.  (*See* Docket No. 23-2, at 23-24.)  The Court previously addressed this argument in Part III.A.2, *supra*, and found no evident partiality.  Accordingly, to the extent these issues relate to "misbehavior by which the rights of any party have been prejudiced" under § 10(a)(3), the Court is satisfied, based on its previous analysis, that this argument does not entitle Questar to vacatur under subsection (a)(3).

and material to the controversy."[11]   Accordingly, the Court will address the former two arguments more fully in its discussion of §10(a)(4), *infra* Part III.C.

### 1. Questar was not denied a fundamentally fair hearing in relation to the testimony of Jason Hargadon.

Questar argues that the Panel allowed Gorter to introduce evidence on a number of key issues through the testimony of Gorter's attorney, Jason Hargadon, but deprived Questar of a fair hearing by allowing Hargadon to assert the attorney-client privilege in response to some of its questions on cross-examination.  (*See* Docket No. 23-2, at 20-22.) In essence, Questar posits that the Panel allowed Gorter to use Hargadon's testimony simultaneously as a "sword" in support of his claims and as a "shield" to key questions posed by Questar on cross-examination.  (Docket No. 23-2, at 21.)   Questar further contends that the attorney-client privilege had been waived as to Hargadon and that the Panel incorrectly concluded that it had not been.  (Docket No. 23-2, at 22.)   Gorter responds with essentially three agreements: (1) that Questar did not establish before the Panel that Gorter waived the privilege, and thus the Panel correctly found no waiver; (2) that even if Questar could establish a waiver, the Panel was not strictly bound by the rules of evidence regarding the attorney-client privilege or waiver thereof; and (3) even if there

---

[11] To the extent Questar intends the former two contentions to implicate § 10(a)(3)'s "any other misbehavior by which the rights of any party have been prejudiced," the Court finds these arguments seem more appropriate under § 10(a)(4)'s grounds of the arbitrators exceeding or improperly executing their powers. This is because refusing to *consider* evidence is not the equivalent, for purposes of § 10(a)(3), of refusing to *hear* evidence.  *See, e.g., In re Arbitration Between Interdigital Commc'ns Corp. and Samsung Elecs. Co.*, 528 F. Supp. 2d 340, 352 (S.D.N.Y. 2007) (rejecting petitioners' argument that "refusal to properly *consider* rather than their outright refusal to *hear* [evidence] justifies vacatur" as contrary to § 10(a)(3)).  Moreover, "vacatur is not appropriate under Section 10(a)(3) where the losing party in an arbitration merely takes issue with the weight accorded to certain evidence actually considered by the panel or with the panel's rejection of arguments related to such evidence."  *Id.*

was a waiver and the Panel should have recognized that waiver, Questar cannot show that any information that would have been elicited from Hargadon would have been material to the Panel's decision such that vacatur is warranted under § 10(a)(3). (*See* Docket No. 28, at 27-31.)

One of the problems presented by a voluminous record such as the record here is the sheer mass from which to extract (*i.e.*, "cherry-pick") particular lines of questioning and testimony in support of or in opposition to a given argument. In considering this issue, the Court has read and examined the entirety of Hargadon's testimony as well as the colloquy among the parties and the Panel immediately prior to that testimony regarding the issues of privilege and waiver. (*See* Tr. of Evid., at 1289-1498.) After carefully reviewing the whole of that transcript, the Court reaches the following conclusions: First, the Court cannot conclude that Gorter waived his attorney-client privilege as to Hargadon; second, even if he did, the Court finds the Panel did not abuse its discretion in permitting Hargadon to assert the privilege in response to certain questions by Gorter's counsel; and third, and perhaps most importantly, even if the privilege was waived and the Panel erred in permitting Hargadon to assert the privilege, the Court finds this error neither rises to the level of making the Panel "guilty of misconduct" nor was so prejudicial as to deny Questar a fundamentally fair hearing such that vacatur is warranted under § 10(a)(3).

Immediately before Hargadon was called as a witness, the parties discussed with the Panel the issues of privilege and waiver. (*See* Tr. of Evid., at 1289-1304.) This discussion shows a great deal of confusion among the parties and the Panel as to Gorter's

intention to waive or not waive the privilege.  However, after a brief recess the hearing resumed, and the transcript more clearly reflects the positions of the parties and the conclusions reached by the Panel.  Chairman Stanton began by acknowledging the confusion and stating, "[I]t was never my intent to require Mr. Hargadon or Mr. Gorter to waive the attorney-client privilege with respect to the testimony of Mr. Hargadon."  (Tr. of Evid., at 1298.)  Gorter then stated it was his desire to preserve the privilege and that he did not wish to waive it.  (Tr. of Evid., at 1299.)  Chairman Stanton recited his understanding that Hargadon was being called only as a fact witness and would testify only to the events and conversations he had with persons other than Gorter.  (Tr. of Evid., at 1299-1300.)  The Panel then invited Questar to respond on the record and lodge its objections, which it did.  (*See* Tr. of Evid., at 1300-1303.)  In spite of Questar's argument that the privilege had been waived, the Panel maintained its ruling throughout Hargadon's testimony that it had not.  Counsel for Gorter stated he would make considerable efforts during his questioning to avoid soliciting any privileged communications and, in fact, did.  Moreover, counsel for Questar, despite unceasingly arguing there had been a waiver, implicitly acknowledged on several occasions the privilege's continued vitality, or at least the lack of waiver.[12]

---

[12] At the risk of itself cherry-picking snippets of dialogue, the Court references the following statements in support of this statement:

    (1)  Questar's counsel's statement during recross-examination after asking whether Hargadon knew what an NASD action against Gorter entails: "A [by Hargadon]: Yes.  It entails -- Q [by Questar's counsel]: Just say yes. . . . I don't want you to waive the privilege." (Tr. of Evid., at 1459); and

    (2)  Questar's counsel's statements during redirect objecting to the question, "Do you know if anyone from Questar had ever met any of Mr. Gorter's clients ever before?" asked by Gorter's counsel: "[Questar's counsel]:  Mr. Chairman, that is going to invade the privilege because the only way he would know is whether Mr. Gorter told him, I think.  So aren't we going a little far afield?" (Tr. of Evid., at 1496).

The bottom line here is that the examination of Hargadon, by both parties, certainly walked a fine line in regard to the privilege issue; still, the Panel found again and again throughout this particular hearing that Questar had not established a waiver of the attorney-client privilege.  As previously stated, "[a]rbitrators are not bound by formal rules of procedure and evidence." *Nat'l Post Office Mailhandlers*, 751 F.2d at 841.  Thus, the decision to find or not find a waiver was within the discretion of the Panel.  Because the Court does not find that Questar has "prove[n] by clear and convincing evidence that the [Panel] had no reasonable basis for [its] decision," the Court is unwilling to conclude that Gorter waived the attorney-client privilege as to Hargadon here.  *See Floyd Cnty. Bd. of Educ.*, 198 F.3d 245, 1999 WL 1023704, at *2 (citing, *e.g.*, *In re Time Constr., Inc.*, 43 F.3d 1041).

Furthermore, even if there was a waiver and the Panel erred in concluding there was not, the Court nonetheless is convinced that § 10(a)(3) does not warrant vacatur based on these facts.  Questar argues that the Panel allowed Hargadon's testimony to be used as a "sword" in support of his claims while allowing Hargadon to assert privilege as a "shield" on cross-examination, thereby preventing Questar from introducing pertinent and material evidence on key issues and depriving it of a fundamentally fair hearing.  These key issues, according to Questar, include "Gorter's sale of his book of business for $4,000,000, Gorter's non-compliance with Questar's request for information and documents, . . . and the timing of Gorter's purported attempt to resign before being terminated." (Docket No. 23-2, at 22.)  But during the examination of Hargadon, Questar had the opportunity to cross-examine the witness and then recross-examine him not once,

not twice, but three times.  (*See* Tr. of Evid., at 1356 (cross), 1483 (recross), 1491 (second recross), 1497 (third recross).)  And throughout the full-day hearing in which he testified, Hargadon asserted the attorney-client privilege only a handful of times and then only when asked questions directly implicating communications with or advice provided to Gorter, his client.  Moreover, a great deal of the information Questar's counsel sought to elicit was either already in the record, had already been testified to by Gorter himself, or was available from other sources free of the constraints of privilege.

For example, Questar focuses heavily on the fact that Hargadon asserted privilege when asked whether he advised Gorter regarding the sale of Gorter's book of business: "Gorter himself initially testified, under oath, that he had sold (not that he would sell, or planned to sell) his book of business for $4,000,000.  Then, when that testimony proved problematic in the arbitration, he sought to create doubt on the issue by having his former attorney suggest that perhaps Gorter had not received the $4,000,000 . . . .  But when Questar attempted to ask questions about the issue, it was thwarted by the improper invocation of attorney-client privilege."  (Docket No. 45, at 12.)  This position, however, does little to support vacatur under § 10(a)(3) for several reasons.  First, to the extent Questar wanted to present evidence that Gorter sold the book of business for $4 million in order to show that Gorter suffered no damages or to show mitigation, this objective was already realized.  In cross-examining Hargadon, Questar read a portion of testimony previously given by Gorter where Gorter acknowledged selling his book of business for $4 million.  (Tr. of Evid., at 1436-37.)  Questar then asked Hargadon whether he was aware of that sale, to which Hargadon replied: "No, I'm not.  I was aware his house went

into foreclosure, so I don't think he got $4 million." (Tr. of Evid., at 1437.) It was only when asked whether he *advised* Gorter regarding the sale did Hargadon assert privilege. (Tr. of Evid., at 1438.) In fact, Gorter's damage expert, Mark Leverenz, testified the next day that Gorter did not actually receive payment for the sale, (Tr. of Evid., at 1569), and Gorter himself also testified three days later that he did not receive the $4 million, (Tr. of Evid., at 2008). Second, Questar's assertion that "[w]ith the Panel's blessing, Hargadon testified regarding a number of key issues, including Gorter's sale of his book of business for $4,000,000" is borderline misleading. It appears that Gorter did not raise the issue at all on direct-examination; it was Questar who first brought up the $4 million sale during its cross. So to the extent Questar wanted to get the $4 million sale in front of the Panel, it did so, despite consistent testimony that the $4 million was never actually received by Gorter. That neither Hargadon's, Leverenz's, nor Gorter's testimony gave Questar the support it wanted does warrant vacatur, nor does the fact that Hargadon asserted privilege well after testifying he was unaware of the sale.

Thus, the Court cannot conclude that Questar was prevented from inquiring into these issues, nor that the Panel is "guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy . . . or any other misbehavior by which the rights of [Questar] have been prejudiced." 9 U.S.C. § 10(a)(3). Accordingly, the Court finds Questar was not denied a fundamentally fair hearing in relation to the testimony of Jason Hargadon.

### 2. Questar was not denied a fundamentally fair hearing in regard to its request that the Panel subpoena more than 50 of Gorter's former clients.

In its October 28, 2011, motion before the Panel, Questar requested that the Panel issue subpoenas to some 55 former clients of Gorter's "to determine the circumstances of their decision to transfer their accounts" for purposes of Questar's damages claim against Gorter. (*See* Docket No. 11-6, at 7-8.) However, in a hearing before the Panel on this motion, Questar conceded it need not call everyone on this list, but insisted it was imperative that it be allowed to cross-examine the 10 who had signed affidavits:

> We understand this is a long list. We need to call all of these people? I assume not. . . .
>
> But out of our list, the 10 who have signed the affidavits is imperative that we be allowed to cross-examine them for all the reasons in our briefs on those. If the panel feels this is too much, at a minimum those ten, we must be able to cross-examine those live in front of the panel . . . .

(Tr. of Evid., at 1260.) The Panel subsequently denied Questar's motion to subpoena all 55, but granted its motion to subpoena the 10 whom Questar identified as "imperative." (Tr. of Evid., at 1276-77.)

As previously stated, arbitrators are not required to hear all the evidence tendered by the parties; they need only afford each party a fair opportunity to present their arguments and evidence. *Urban Assocs.*, 2012 WL 1079720, at *4 (citing *Terk Techs. Corp.*, 86 F. Supp. 2d at 709); *see also Nat'l Post Office*, 751 F.2d at 841 ("Contrary to the [petitioner's] suggestion, fundamental fairness does not require than arbitrator hear any and all evidence that a party might wish to offer . . . ."). An arbitration panel, like a

trial court, enjoys broad discretion in deciding whether to allow testimony.  *E.g.*, *Urban Assocs.*, 2012 WL 1079720, at *5; *Terk Techs. Corp.*, 86 F. Supp. 2d at 709.  Accordingly, not every failure to receive evidence constitutes misconduct under § 10(a)(3).  *See Urban Assocs.*, 2012 WL 1079723, at *11 (referencing *Century Indem. Co.*, 584 F.3d at 557; *Fairchild Corp.*, 510 F. Supp. 2d at 287).  Thus, a petitioner must show that the excluded evidence was material to the arbitrators' determination and that their refusal to hear the evidence was so prejudicial that the party was denied fundamental fairness.  *Warren*, 114 F. Supp. 2d at 602.  Questar has failed to make such a showing here.  The decision not to subpoena all 55 former clients but instead to subpoena only the 10 who had submitted affidavits was within the Panel's discretion.  *See Nat'l Post Office*, 751 F.2d at 841 (affirming an arbitrator's discretion in limiting cumulative evidence).  Moreover, Questar expressly conceded that all 55 were not necessary and requested that at minimum the Panel subpoena the 10 most imperative, which it did.[13]

\* \* \* \* \*

Accordingly, for these reasons, the Court will not vacate the arbitration award on the basis of a refusal to hear evidence or a lack of fundamental fairness under 9 U.S.C. § 10(a)(3).

---

[13] Gorter avers that "it must have not been as imperative as counsel for Questar initially argued, because Questar did not serve these 10 subpoenas (or if Questar did, it did not call any of the 10 as witnesses."  (Docket No. 11-1, at 30.)  Questar has not directly refuted this statement, and the Court's review of the arbitration proceedings reveals that of the 55 Questar requested be subpoenaed and the 10 that were, Questar called none to testify.  Six of the individuals on the list of 55 were called to testify but by Gorter, not Questar, and Questar was afforded the opportunity to cross-examine each.  (*See* Tr. of Evid., at 1767-1854.)  Therefore, these facts further dissuade the Court that vacatur is warranted on these grounds.

### C.    Arbitrators Exceeding or So Imperfectly Executing Their Powers

Questar further argues that vacatur is warranted under § 10(a)(4) because "[t]he Panel exceeded it powers or imperfectly executed them by awarding substantial damages on claims which were not factually supported by the record."  (Docket No. 23-2, at 25.) Specifically, Questar maintains that (1) neither Gorter's contract claim nor his defamation claim are not supported by the record, and (2) the Panel exceeded or imperfectly executed its powers to the extent it based the award on Gorter's negligence and negligence *per se* claims, or on his tortious interference claim.  (Docket No. 23-2, at 25-38.)

Unfortunately, the award is devoid of any rationale or explanation as to the factual basis for the Panel's decision, the particular theory or cause of action upon which the award is based, and/or how the Panel calculated the award figure.  But, importantly, this is precisely the outcome contracted for between the parties.  *Cf. United Steelworkers v. Enter. Wheel & Car Co.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award."); *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000) ("Arbitrators are not required to explain their decisions.").  The FINRA Rules, which the parties agreed would govern the arbitration via their Uniform Submission Agreement, state only that "[t]he award *may* contain a rationale underlying the award." FINRA Rule 13904(f) (emphasis added).  Paragraph (g) of Rule 13904 provides that the parties may request an "explained decision," which subparagraph (g)(2) defines as "a fact-based award stating the general reason(s) for the arbitrators' decision."  *Cf. Green v. Ameritech Corp.*, 200 F.3d 967, 976 (6th Cir. 2000) ("If parties to an arbitration wish a more detailed arbitral opinion, they should clearly state in the agreement the degree of

specificity required.").  Apparently, no such request was made here.  And, as the Sixth Circuit has stressed, where the arbitral agreement imposes no duty of explanation on the arbitrator, "remand for the purpose of having the arbitrator clarify his reasoning would be inappropriate."  *Id.* at 977 n.9.

Thus, the Court is presented with an unexplained award; four separate legal theories, any one or more of which could have been the Panel's basis for its award; and a voluminous record of arbitration filings, a multitude of exhibits, and thousands of pages of transcription.  And with this, Questar effectively would have the Court conduct a review on the merits, eliminating every legally plausible line of reasoning that would support the award based on each of Gorter's four legal theories, and then vacate the award by finding that the Panel exceeded its powers under § 10(a)(4).  The FAA, however, does not provide the Court such authority, and the Court will not be lured into reviewing the merits of the Panel's decision. *See, e.g.*, *Wachovia Sec., Inc. v. Gangale*, 125 F. App'x 671, 677 (6th Cir. 2005) ("[N]either the trial court nor [the] Court [of Appeals] may reconsider the merits of an award, even when the parties allege that the award rests on errors of fact or on misinterpretation of a [contract].").  Even if Questar's claims could serve as a proper basis for vacatur, the Court, fortunately, need not go farther than Questar's first argument to conclude that vacatur is not warranted under § 10(a)(4).  Questar argues that the award "is not rationally supported by, or derived from the [RRA] and therefore cannot be upheld on those grounds."  (Docket No. 23-2, at 28.) The Court disagrees.

In this Circuit, "[t]he burden of proving that the arbitrators exceeded their authority is great."  *Solvay Pharm., Inc. v. Duramed Pharm., Inc.* 442 F.3d 471, 476 (6th Cir. 2006) (quoting *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 845 (6th Cir. 2003)).  "[C]ourts must accord an arbitrator's decision substantial deference because it is the arbitrator's construction of the agreement, not the court's construction, to which the parties have agreed."  *Id.* (quoting *Beacon Journal Publ'g Co. v. Akron Newspaper Guild, Local No. 7*, 114 F.3d 596, 599 (6th Cir. 1997)).  Because "[a]rbitration is a matter of contract . . . [t]he terms of the [arbitration] contract define the powers of the arbitrator, and 'as long as the arbitrator is even arguably construing or applying the [arbitration] contract and action within the scope of his authority, that a court is convinced he committed a serious error does not suffice to overturn his decision.'"  *Id.* at 475-76 (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).  Further, "courts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious *legal* or *factual* error."  *Id.* at 476 (alteration omitted) (second emphasis added) (quoting *Merrill Lynch, Pierce, Fenner & Smith v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).

Following the Supreme Court's guidance in *United Steelworkers*, the Sixth Circuit has instructed, "if the arbitrator's award draws its essence from the . . . agreement,' and is not merely the arbitrator's own brand of industrial justice, the award is legitimate."  *Solvay*, 442 F.3d at 476 (internal quotation marks omitted) (quoting *Beacon Journal Publ'g*, 114 F.3d at 599; *United Steelworkers*, 363 U.S. at 597).  An award fails to "draw its essence from the agreement" when:

> (1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on "general considerations of fairness and equity" instead of the exact terms of the agreement.

*Id.* (quoting *Beacon Journal Publ'g*, 114 F.3d at 600).  However, before proceeding to the "draws its essence" analysis, a court must first determine "whether a claim that arbitrators have exceeded their powers attacks the 'arbitrability' of a particular matter, or merely the consistency of an award with the terms of a[n] [arbitration] contract on a matter that is properly arbitrable."  *Id.* at 477.  Here, Questar's argument is properly characterized as the latter: a challenge to the consistency of the award with the terms of the arbitration agreement.[14]  But Questar's reasoning on this argument is off-point.  Questar insists that the award "does not draw its essence from the Agreement attached to the Statement of Claim."  (Docket No. 23-2, at 25.)  But the "Agreement" to which Questar refers is the RRA, not the *arbitration agreement* (which here is the Uniform Submission Agreement).[15]  A careful reading of *Solvay* makes clear that the "draws its essence" analysis is thus applicable to the Uniform Submission Agreement, as the arbitration

---

[14] This conclusion is buttressed, in no small part, by the fact that Questar argues its position in terms of the more deferential standard of whether the award "draws its essence." (Docket No. 23-2, at 25); *see Solvay*, 442 F.3d at 477-78 (distinguishing the "more deferential 'draws its essence' test" from the less deferential test applied where a petitioner challenges "the 'arbitrability' of a particular matter").

[15] On page 2 of its Memorandum of Law, Questar refers textually to "an Agreement," which it then identifies parenthetically as the "Registered Representative Agreement" attached as Exhibit 1, (*see* Docket No. 23-3). In its "draws its essence" analysis, Questar again cites the RRA in reference to "the Agreement." (Docket No. 23-2, at 25.) Thus it is clear that Questar refers to the RRA in its argument, not the Uniform Submission Agreement.

agreement, and not to the underlying contractual agreement, the RRA.[16]  Accordingly, to the extent Questar focuses its analysis on the RRA, its argument misses the point.

Proceeding now to the question whether the award fails to draw its essence from the arbitration agreement (*i.e.*, the Uniform Submission Agreement), the second and fourth draws-its-essence elements seem inapplicable here.   The second element is inapplicable because the damage award imposed no requirements;[17] the fourth is inapplicable because the Panel gave no indication that its award was motivated by considerations of fairness and equity rather than the terms of the arbitration contract. Thus, the Court is left with the first and third elements.   The first element, whether the award conflicts with the express terms of the contract, offers little help to Questar here. Because the award is silent as to the Panel's reasoning (other than to state that the arbitrators acknowledge having read the pleadings and other materials provided by the parties, and that the award is based on the arbitrators' consideration of the pleadings, testimony, and evidence presented at the hearing), the award cannot be read as conflicting with the express terms of the Uniform Submission Agreement.

Therefore, all that remains is the third draws-its-essence element:  whether the award was "rationally supported by or derived from" the Uniform Submission

---

[16] Moreover, Questar has not alleged that the RRA contained an arbitration clause or provision, but rather expressly stated that "Pursuant to the Uniform Submission Agreement, Questar agreed to arbitrate the present matter in controversy."  (Docket No. 23-2, at 12 (internal quotation marks omitted).)  This situation is distinguishable from the factual circumstances in many of the cases discussed in this Part, where the arbitration agreement itself is contained within the contract underlying the dispute.

[17] Questar asserts that the award does not draw its essence from the agreement, meaning the RRA, because it would "impose the additional extra-contractual obligation of requiring Questar to advise Gorter regarding state licensing requirements."  (Docket No. 23-2, at 28.)  But again, this misses the point by focusing on the RRA, not the arbitration agreement.  Thus, this argument is without merit because the award clearly imposes no additional requirements not expressly provided for in the Uniform Submission Agreement.

Agreement. *Solvay*, 442 F.3d at 482. Here, as noted above, "[i]f a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Id.* at 483 (alteration in original) (quoting *Jaros*, 70 F.3d at 421). Questar argues at length why a finding for Gorter on each of his four theories was not supported by the evidence in the record. However, this argument again misses the point. Questar effectively wants this Court to review the Panel's decision and conclude it is not supported by the evidence or was based on an erroneous determination of contested issues. But the Court will not review, as Questar urges, whether each of Gorter's claims is supported by the record. The Panel has already done so and, despite providing no explanation as to which theory or theories on which it based its award, has decided that the evidence before it supported an award based on one or more of Gorter's claims. The Panel heard evidence as to each of Gorter's claims as well as to the calculation of damages. Questar was afforded an opportunity to challenge this evidence by presenting evidence of its own and cross-examining Gorter's witnesses. The Panel then proceeded to weigh the evidence before it and issue an award. Whether the evidence satisfied the elements for each of Gorter's claims and supported an award on any or all of his theories was for the Panel to decide, which it did, albeit without exposition, by issuing an award in favor of Gorter. *See Solvay*, 442 F.3d at 485 (concluding that "courts must defer to an arbitration panel's interpretive determinations of even legal questions, particularly where the legal standard requires [a fact-based inquiry]").

To conclude, Questar has failed to convince the Court that the award was not "rationally supported by or derived from" the Uniform Submission Agreement and that

there exists no "line of argument that is legally plausible [to] support[] the award." *Solvay*, 442 F.3d at 482-83.  The Supreme Court and this Circuit have both admonished courts that "as long as the arbitrator is even arguably construing or applying the contract [to arbitrate] and acting within the scope of his authority, that a court is convinced he committed a serious error does not suffice to overturn his decision"; accordingly, "courts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious legal or factual error."  *Misco*, 484 U.S. at 38; *Solvay*, 442 F.3d at 476.  Furthermore, in applying the Supreme Court's decisions in this context, the Sixth Circuit, *en banc*, unequivocally held:

> *Misco* and *Garvey* show that the [Supreme] Court means what it is saying.  In both cases, the Court held that once it is established that the arbitrator was construing or applying the [arbitration] contract (and acting within the scope of his authority), it made no difference whether the arbitrator had committed "serious," "improvident" or even "silly" errors in resolving the merits of the dispute.

*Mich. Family Res., Inc. v. Serv. Emps. Int'l Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007) (en banc) (applying *Misco*, 484 U.S. at 38-39; *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509-10 (2001)).  Here, the Court finds nothing to suggest that the Panel was not arguably construing the Uniform Submission Agreement nor was acting outside the scope of its authority. Therefore, the Court finds that the Panel did not exceed its powers by awarding Gorter damages and that vacatur is not warranted under 9 U.S.C. § 10(a)(4).

### D.    Manifest Disregard for the Law

Finally, Questar argues that the award should be vacated because it was issued in manifest disregard for the law.  (Docket No. 23-2, at 38-40.)   In this vein, Questar essentially raises three reasons why vacatur is warranted: (1) the damage award "is unsupported by any evidence, and based on a contract which was not submitted as the basis of the claims in the arbitration"; (2) the Panel "craft[ed] its own, inconsistent remedy that denied Gorter's expungement request, yet still awarded him over $3.2 million in damages"; and (3) "none of Gorter's claims satisfy the elements required by law."[18]  (Docket No. 23-2, at 39-40.)

"To constitute a manifest disregard for the law, '[a] mere error in interpretation or application of the law is insufficient.  Rather, the decision must fly in the face of clearly established precedent.'"  *Coffee Beanery, Ltd. v. WW L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008) (alteration in original) (quoting *Jaros*, 70 F.3d at 421).   An arbitrator acts with manifest disregard for the law where "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle."  *Id.* (quoting *Jaros*, 70 F.3d at 421).   But, as stated *supra* Part III.C, "[a]rbitrators are not required to explain their decisions."  *Dawahare*, 210 F.3d at 669. On this point, the Sixth Circuit has expressly reasoned:  "If they choose not to do so, it is all but impossible to determine whether they acted with manifest disregard for the law." *Id.* (citing *Jaros*, 70 F.3d at 421); *see also Federated Dep't Stores, Inc. v. J.V.B. Indus.,*

---

[18] Questar also alludes to the issues of Chairman Stanton's "failure . . . to investigate and disclose his conflict," the circumstances involving Questar's cross-examination of Gorter's witness Jason Hargadon, and "the overall conduct of the trial" as grounds for vacatur.  These issues have been addressed previously in this Opinion, and, based on its analysis thereof, the Court finds no reason to discuss these issues further in its "manifest disregard of law" discussion.

*Inc.*, 894 F.2d 862, 871 (6th Cir. 1990) (Martin, J., concurring) (characterizing the situation of an unexplained arbitral award as making the court's review "something of a judicial snipe hunt with counsel for the parties arguing about [legal] analysis that may or may not have been manifestly disregarded by the arbitrator").

Further, while the Sixth Circuit has recognized "manifest disregard of *law*" as a basis for vacating an arbitration award, it is anything but apparent that the court has also adopted the ground of "manifest disregard of *fact*." *Coffee Beanery Ltd. v. WW L.L.C.*, 501 F. Supp. 2d 955, 963 (E.D. Mich. 2007), *rev'd on other grounds*, 300 F. App'x at 415. "[I]t is the arbitrator's role to make factual findings, weigh evidence, and assess the credibility of witnesses, and it is well-settled that a federal court may not conduct a reassessment of the evidentiary record." *Id.* at 964 (internal quotation marks omitted) (quoting *Nicholls v. Brookdale Univ. Hosp. & Med. Ctr.*, 204 F. App'x 40, 43 (2d Cir. 2006)). As another district court in this circuit has put it: "Arbitration does not provide a system of 'junior varsity trial courts' affording the losing party complete and rigorous *de novo* review." *Terk Techs. Corp. v. Dockery*, 86 F. Supp. 2d 706, 708 (E.D. Mich. 2000), *aff'd*, 3 F. App'x 459 (6th Cir. 2001).

Here, the Panel's award provides a basic summary of the case, including Gorter's causes of action; Questar's answer and counterclaim causes of action; a recap of the briefs, motions, and memoranda of law filed during the proceedings, as well as the Panel's rulings on those motions; the relief requested by each party; a breakdown of the award for costs and compensatory damages in favor of Gorter, as well as the interest on that award; and the Panel's denial of all other requested relief. (*See* Docket No. 1-3.)

Whether, as Questar argues, the award was unsupported by evidence or based on evidence Questar contends should not have been considered in calculating damages does not support a finding that the Panel manifestly disregarded the law.  *See Coffee Beanery Ltd.*, 501 F. Supp. 2d at 963-64.  Similarly, whether the evidence presented was sufficient to establish the elements of any or all of Gorter's claims likewise does not establish manifest disregard for the law.  *See id.*  And whether the Panel erred in interpreting the applicable law in either regard is also insufficient to warrant vacatur.  *Coffee Beanery, Ltd.*, 300 F. App'x at 418;  *Jaros*, 70 F.3d at 421.  Lastly, Questar has not established manifest disregard in the Panel's allegedly "inconsistent remedy," nor that a clearly defined legal principle prohibits such a remedy.  This is not a case in which Questar clearly stated an applicable legal standard and the Panel expressly chose to disregard it.  Ultimately, the fact that the Panel issued its award without an accompanying explanation—an outcome which the parties expressly contracted for— makes it all but impossible for the Court to conclude that the Panel manifestly disregarded the law here.  The Court declines to further review the merits of the award as Questar urges, because to do so would necessarily undermine the purpose of the FAA and run contrary to established precedent in this Circuit.

Accordingly, the Court finds that the Panel did not issue its award in manifest disregard for the law and that vacatur is not warranted on this basis.

* * * * *

For these reasons, Questar's Petition to Vacate, (Docket No. 1), and Motion to Vacate, (Docket No. 23), are DENIED; Gorter's Combined Motion to Dismiss and/or for

Summary Judgment and Motion to Confirm Arbitration Award, (Docket No. 11) is GRANTED IN PART and DENIED IN PART as follows: Gorter's Motion to Confirm is GRANTED, and his Motion to Dismiss and/or for Summary Judgment is DENIED as moot.

CONCLUSION

For the foregoing reasons, the Court concludes that vacatur of the arbitration award is not warranted, and the award must therefore be confirmed.  An appropriate Order will issue separately consistent with this Opinion.

Date:

cc:     Counsel